IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIKA E. SIFRIT,                          *
                    Petitioner,
         v.                               *   CIVIL ACTION NO. RDB-12-0910

RANDALL S. NERO, et al.,                  *
                    Respondents.
                                        ***

## MEMORANDUM OPINION

Now before the Court is Petitioner's counselled Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. §2254 seeking relief from her state court convictions.  A Response to the Petition for Writ of Habeas Corpus, along with exhibits and Petitioner's Reply, were filed. The matter is now ready for dispositive review.  The Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2014); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (Petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)).  For the reasons to follow, the Petition will be denied and dismissed with prejudice.

### Factual and Procedural History

Petitioner and her husband Benjamin (BJ) Sifrit were charged in the Circuit Court for Worcester County with the murders of Martha Crutchley and Joshua Ford.  ECF No. 9, Exs. 1, 16 & 17.  Petitioner and her husband were tried separately in alternate locations.  Benjamin Sifrit was tried first in the Circuit Court for Montgomery County, the Honorable Paul H. Weinstein presiding.  *Id.*, Ex. 17.  Thereafter, Petitioner was tried by a jury in the Circuit Court for Frederick County, the Honorable G. Edward Dwyer presiding, in June of 2003. *Id.*, Ex. 7-11. The facts developed at both trials, as recounted by the Court of Appeals of Maryland, follow:

On Friday, May 24, 2002, Martha Crutchley and her boyfriend, Joshua Ford, drove from Virginia to Ocean City, Maryland, for the Memorial Day weekend. Erika and her husband Benjamin were also vacationing in Ocean City over the holiday weekend. On Saturday night, May 25, 2002, the Sifrits met Ms. Crutchley and Mr. Ford on a bus on their way to Seacrets, a popular Ocean City nightclub. The Sifrits did not have the exact change for the fare so Ms. Crutchley and Mr. Ford offered to pay the Sifrits' fare if they would buy them a drink when they arrived at Seacrets. The foursome and two other people from the bus, friends Anne Carlino and Jeff Hysee, spent the rest of the evening together at Seacrets.

What happened in the early morning hours following the night at Seacrets is unknown. We do know, however, that at 3:00 a.m. on Sunday, May 26, 2002, Erika called 911 claiming that people she did not know were in her condominium unit and she could not find her purse. She was "afraid I'm going to have a robbery here." The call abruptly ended and no one was dispatched to the condominium.

On Tuesday, May 28, 2002, one of Ms. Crutchley's co-workers notified the Fairfax City police that Martha Crutchley failed to show up at work following the Memorial Day weekend. Fairfax City police contacted the Ocean City police who found Ms. Crutchley's car outside the condominium where she and Mr. Ford were staying for the weekend. The police found the couple's belongings left in their condominium as if they had just stepped out. Concerned about Ms. Crutchley and Mr. Ford, the police began to search actively for them.

On May 31, 2002, around midnight, the Ocean City Police Department responded to an alarm call from the closed-for-the-night Hooters Restaurant and Bar merchandise store on 122nd Street in Ocean City. There they found Erika and Benjamin loading Hooters merchandise into their Jeep Cherokee. The couple were placed in handcuffs. Upon searching the couple, the police found a 9 millimeter handgun and a knife on Benjamin and a fully-loaded .357 magnum revolver tucked into Erika's blue jeans in the small of her back. Another knife was found on Erika. Discovered in the Sifrits' car were a .45 caliber gun, ski masks, flex cuffs, and tape.[4]  The two were arrested and charged with burglary.

At the scene of the burglary, Erika told the officers that she had anxiety problems and that she needed her Xanax and Paxil from a brown leather pouch in her purse located in the front of the Jeep. One of the police officers, Sgt. Beene, looked in Erika's purse for the pills. He found only one type of pill inside the brown leather pouch. Sgt. Beene continued to look for the other type of pill inside a red pouch because he noticed medicine bottles in that pouch. When the officer did not find the second type of pill in the red pouch he looked in a zippered pouch in the back of the purse. There he discovered four spent .357 magnum shell casings and one live round. The sergeant continued to look for the second type of

pill in a gray change purse, also inside Erika's purse, and found the identification cards of Mr. Ford and Ms. Crutchley.[5] Fearing for the safety of Ms. Crutchley and Mr. Ford, the police ordered an immediate search of the Sifrits' condominium.

Upon entering the Sifrits' condominium, the police observed photographs and two bullets on a glass table. The pictures were of the Sifrits, Ms. Crutchley, and Mr. Ford, taken before the murders. Both of the bullets on the table had been fired from the .357 magnum recovered from Erika at Hooters, and one of the bullets had Mr. Ford's blood and tissue on it. Police also found a key to Ms. Crutchley and Mr. Ford's condominium on another table. Crime scene technicians found bloodstains in the Sifrits' master bathroom on the top of the counter, the underside of the counter top, the floor, the floor under the vanity, the back side of the bottom drawer of the vanity, under the mirror, under the baseboard, under the hot tub faucet, on the hot tub step, on a sailboat candle holder on the hot tub, on the window, and in the shower. Swabs were taken from these bloodstains, which were all later identified as matching the DNA of either Ms. Crutchley or Mr. Ford. There was also a hole in the back wall of the bathroom, fresh paint on the wall, and numerous cleaning supplies on the floor next to the bathroom door. The cleaning supplies, it was later discovered, had been purchased on Sunday, May 26, 2002, the day after Martha Crutchley and Joshua Ford were murdered.

Later, at the police station, Erika agreed to take Detective Bernal to where she claimed the bodies of Martha Crutchley and Joshua Ford were located. Erika directed Det. Bernal to two dumpsters located behind grocery stores in Rehoboth Beach, Delaware. Other officers went to the stores to check the dumpsters but did not find the bodies. While Detective Bernal traveled with Erika to the places where she claimed he could find the bodies, she told the detective that her husband, Benjamin had shot Mr. Ford and Ms. Crutchley, "cut their bodies into piece" and "put them in garbage bags."

On June 2, 2002, Erika's then attorney, Arcangelo Tuminelli, entered into negotiations with Joel Todd, the State's Attorney for Worcester County, regarding the charges against Erika. A Memorandum of Understanding (MOU) came out of those negotiations. The MOU stated that Erika agreed to "cooperate with the State in the prosecution of Benjamin, her husband, and further agrees to testify truthfully on behalf of the State at his trial." The MOU provided that the State would not seek a sentence of death or life without parole against Erika as long as she provided reliable information to the State ". . . detailing the way and manner in which the bodies of Martha Margene Crutchley and Joshua Ford were packaged prior to disposal, as well as information on the location where bodies were disposed of." The MOU also provided that if Erika took a polygraph examination and if she tested ". . . 'not deceptive' on all material questions related to the homicides of the victims . . ." then the State would not prosecute Erika for

the homicide charges. The exact language of the relevant portion of the MOU is as follows:

> Additionally, Defendant agrees to subject herself to a polygraph examination to be conducted by an active federal polygraph examiner, said examiner to be agreed upon by the State and Defendant. If Defendant tests "not deceptive" on all material questions related to the homicides of the victims referenced in Paragraph 1 above asked of her by the polygraph examiner, and absent any compelling independent evidence to the contrary (*i.e.* eye witness testimony, photographs and/or prospective reliable inculpatory statements by the Defendant) the State agrees not to prosecute Defendant for these homicide charges.

After the MOU was executed, Erika told Detective Bernal that most of Joshua Ford's and Martha Crutchley's body parts were in black garbage bags that Benjamin had packed into Navy kit bags before throwing in a dumpster. Erika told the detective that she helped Benjamin throw the bags containing the body parts in a dumpster behind a Food Lion grocery store.  The Food Lion dumpster was located across the street from the dumpster that Erika had previously directed the detective to search. After searching the landfill where the contents of the Food Lion dumpster had been emptied, police recovered body parts of Mr. Ford and Ms. Crutchley. Police recovered only the left leg of Ms. Crutchley. Thus, her cause of death was never determined. Police recovered the torso and both arms of Mr. Ford. Additionally, two bullets fired from the .357 magnum recovered from Erika at Hooters on the night of May 31 were found in Mr. Ford's torso.

In an interview with Detective Bernal on June 24, 2002, Erika admitted to being present in the condominium that she shared with Benjamin when three of the shots were fired. Erika was scheduled to have a polygraph examination on July 23, 2002, but Deputy State's Attorney Scott Collins terminated the polygraph because of incriminating statements that Erika made in her prepolygraph interview with United States Secret Service agents[2] Erika filed a Motion to Enforce the Memorandum, which she claimed required that the State give her the polygraph examination. The Circuit Court for Worcester County denied the Motion to Enforce the Memorandum on the grounds that the incriminating statements that Erika had made violated a condition of the MOU.

At Erika's jury trial, much testimony was received concerning Erika's behavior in the days after Martha Crutchley and Joshua Ford were killed. On Tuesday, May 28, 2002, Erika and Benjamin went outlet shopping in Rehoboth Beach. Erika got a new tattoo, and the couple went to a Home Depot store to buy supplies to replace the bathroom door and to purchase paint for the condominium.

At the Home Depot, Erika met and spoke to Anne Wright, who testified at the trial as follows:

> Q Now I want to direct your attention back to May 28th of 2002
> last year. Were you in Ocean City resort area about that time?
> A Yes.
> Q And did you have occasion to go to the local Home Depot store?
> A We did . . .
> * * *
> Q And who did you meet?
> A Erika Sifrit
> Q And did you see anyone else with her?
> A Um, her husband.
> * * *
> Q Okay. Was the Defendant carrying anything?
> A Um, she had a triangular shaped piece of wood.
> Q And did she say anything to you about this triangular shaped
> piece of wood?
> A She said do you believe that's all that's left of my door.
> Q And did you respond?
> A And I said that must have been some party.
> Q Did she respond to you?
> A She laughed and said I guess you could call it that.

The State's theory in both cases was that after leaving Seacrets that night, the two couples had returned to the Sifrits' condominium. Once in the condominium the Sifrits engaged in a "missing purse game" in which they claimed Erika's purse was missing. They demanded the other couple find the purse and when it couldn't be found, somehow got them into the upstairs bathroom where both Sifrits shot Mr. Ford and in some other manner killed Ms. Crutchley.

The State's theory is based in part on the testimony of Melissa Seling ("Melissa") who met the Sifrits the night of May 29 through her friend Justin Todd Wright ("Todd"). Melissa testified that when she met Todd, he and the Sifrits were intoxicated and she was the only one that was sober. Melissa joined the Sifrits and Todd at a couple of bars but she did not drink. At the end of the evening, Melissa was worried about Benjamin's ability to drive so she agreed to follow the Sifrits back to their condominium. When the four arrived at the condominium, Melissa, at Benjamin's urging, helped Erika up to the condominium because she seemed so intoxicated that she might fall over without help. Then, once at the door, Erika located her keys in her purse and opened the door with no problem. Erika began showing Melissa around the condominium.

Within 5-10 minutes of having the purse at the door, Erika and Benjamin claimed that someone had taken Erika's purse and that Melissa had to look for it.

At some point during the search for the purse, Benjamin brandished a gun and became more adamant about finding the purse. Benjamin made a number of statements during the search regarding people that had been there before who had tried to rip them off and that he was "doing the world a justice by ridding the earth of bad people." Melissa testified that he also told her "if we ripped them off . . . he would kill us the same way he killed those other people." Melissa was not clear in her recollection whether Benjamin had said "just like **I** killed the other people" or "just like **we** killed the other people" (emphasis added). Melissa testified that she felt threatened by the gun and asked that it be put away. She also testified that during the search she saw a door upstairs off of its hinges with a bullet hole in it. Eventually, Benjamin discovered the purse in a location that had previously been searched. He then sat down with Melissa to show her his gun and what he called Erika's gun, the .357 magnum used to kill Joshua Ford.

_____

[2] As set forth in more detail below, during the pre-polygraph interview, Erika admitted to Secret Service agents that she was present when Benjamin, armed with a handgun and under the belief that Crutchley and Ford had stolen the Sifrits' personal items, ordered Crutchley and Ford into the upstairs bathroom. Respondents' Exhibit 16 at 22.

Erika stated that Benjamin then asked her what he should do, and she told Benjamin that he should "do it," meaning he should shoot Crutchley and Ford. *Id.* Benjamin fired four shots from the handgun he was holding, one of which was a "head shot" to Ford. *Id.* at 23. Erika admitted during the interview that she thereafter used a knife to cut Crutchley's body. *Id.* This evidence was not introduced at Erika's trial.

[4]Investigators later found other items in the Jeep including but not limited to a knife, gloves, and undeveloped film.

[5] There was also a silver ring with a dragon engraving found in Erika's purse that was later identified as belonging to Mr. Ford. DNA testing revealed blood from both Joshua Ford and Martha Crutchley on the ring. Ms. Crutchley was a major contributor to the DNA sample found on the ring and Mr. Ford was a minor contributor, according to a forensic chemist for the State of Maryland.

[6] Erika never took the polygraph examination.

*Id.*, Ex. 16, p, 3-11.

Benjamin Sifrit was convicted of second degree murder and first degree assault of Crutchley and accessory after the fact for the murders of both Crutchley and Ford. *Id.*, Ex. 17. He also pleaded guilty to second degree burglary and carrying a dangerous weapon.  He was sentenced on July 7, 2003, to a 30 year term of imprisonment for second degree murder, a concurrent term of 15 years for first degree assault, a consecutive five year term of imprisonment for accessory after the fact, a consecutive three year term for second degree burglary and a concurrent three year term for carrying a dangerous weapon.  *Id.*

Petitioner was convicted on June 10, 2003, of the first-degree murder of Ford, second degree murder of Crutchley and theft charges in regard to the burglary at Hooters.  *Id.*, Ex. 16. She was sentenced to life imprisonment for the first degree murder of Ford, a consecutive 20 year term for the second degree murder of Crutchley, and a concurrent term of 18 months for the theft charges.  *Id.*

She noted a timely appeal.  The Court of Appeals, on its own initiative, took Petitioner's case before it was considered by the Court of Special Appeals.  Thereafter, Benjamin Sifrit's request that the Court of Appeals also take his appeal was granted.  In her appeal, Petitioner raised the following claims:

> I.      Did the State breach its written agreement with Ms. Sifrit that it would not prosecute her for murder if she could provide "reliable" information to the State about the murders of Ms. Crutchley and Mr. Ford and test "not deceptive" on a polygraph examination when, after accepting the benefit of the information Ms. Sifrit provided, the State refused to administer the polygraph because Ms. Sifrit had not fulfilled a supposed condition precedent that was not contained in the written agreement?

> II.     Did the factual theory that the State presented to the jury in this case violate principles of fundamental fairness and Ms. Sifrit's due process rights by directly contradicting the factual theory that the State advanced in the earlier

prosecution of Ms. Sifrit's husband, Benjamin Sifrit, whom the State accused of committing the  same crimes?

III.    Did the police unlawfully search Ms. Sifrit's purse when 10-20 minutes after her arrest she asked an officer to retrieve her medicine from a specified brown zippered pouch in her purse, and the officer recovered incriminating evidence after opening and entering other sealed containers in her purse?

*Id.* Ex. 13, p. 2.

Petitioner's convictions were affirmed.  *Id.*, Ex. 16 & 17.  Petitioner filed a petition for writ of certiorari in the United States Supreme Court, which was denied on January 10, 2005. *See Sifrit v. Maryland,* 543 U.S. 1056 (2005).

Petitioner instituted state post-conviction proceedings on September 7, 2005.  *Id.*, Ex. 2. Subsequently, Petitioner filed a counseled consolidated post-conviction petition claiming trial counsel was ineffective for:

1.    failing to investigate her history of mental illness;
2.    failing to mount a sufficient defense to the aiding and abetting charges;
3.    not pursuing a voluntary intoxication defense to first degree murder;
4.    allowing her to waive her right to remain silent and submit to an interview;
5.    calling Melissa Seling to testify as a defense witness; and
6.    the cumulative effect of these errors.

*Id.*, Ex. 18, pp. 4-14.

Hearings on Petitioner's claims were held on January 5, 2009, January 7, 2009, and February 9, 2009,  *id.*, Ex. 19-21,  and post-hearing memoranda were submitted by the parties. *Id.*, Ex. 22-25.  In a statement of reasons entered on March 12, 2009, post-conviction relief was denied. ECF No. 1, Ex. 1.

Petitioner filed an application for leave to appeal the adverse findings of the post-conviction court.  ECF No. 9, Ex. 26.  Initially, the application raised one question:

> When the State's proof of a defendant's role in the murder is strong, and the defendant has obvious mental health disorders, how much investigation must a trial attorney do of those disorders to explore whether a NCR plea or some other similar defense, such as intoxication would be warranted?

*Id.* Petitioner also argued that trial counsel's deficient investigation deprived her of the opportunity to raise a not criminally responsible (NCR) defense. *Id.*, 2-3, 8, 10, 12-13, 16, 19. Petitioner further claimed that trial counsel was ineffective for calling Melissa Seling as a defense witness and allowing Petitioner to waive her right to remain silent and submit to an interview with law enforcement. Petitioner reiterated her claim of cumulative error. *Id.*, p. 30. The application for leave to appeal was summarily denied by the Court of Special Appeals in an unreported opinion on December 19, 2011.[1] ECF No. 1, Ex. 2.

In the instant Petition, as renumbered by Respondents, Petitioner maintains that:

1. Trial Counsel Rendered Ineffective Assistance of Counsel Which Prejudiced Petitioner By Failing to Obtain and Use Mental Health Evidence Including NCR and Intoxication, Requiring a New Trial on All Count of Conviction.

2. Trial Counsel Rendered Ineffective Assistance of Counsel Which Prejudiced Petitioner in Calling Ms. Melissa Seling as a Defense Witness.

3. Trial Counsel Rendered Ineffective Assistance of Counsel Which Prejudiced Petitioner in Advising Ms. Sifrit and Otherwise Counseling and Representing Her in Connection With Her Waiver of Her Right to Remain Silent in a Pretrial Interview with the Secret Service.

4. Viewed Cumulatively, Viewing All of the Errors of Trial Counsel Collectively, Petitioner Was Denied The Effective Assistance Of Counsel Which Prejudiced Petitioner.

5. The State Failed to Comply with the Express Terms of the Memorandum of Understanding Where the State Agreed Not to Prosecute Petitioner for Murder if Certain Conditions Were Met.

---

[1] The court's mandate issued on January 19, 2012. *Id.*, Ex. 2.

6.The State Violated Fundamental Principles of Fairness and Due Process Found in the Constitution and the Bill of Rights By Presenting Two Directly Conflicting Theories in Separate Trials of Erika and her Then Husband BJ, Both of Whom Were charged with Committing the Same Crimes.

7.The State Violated Ms. Sifrit's Fourth Amendment and other Constitutional Rights When they Conducted an Unlawful Search of Her Purse.

ECF No. 1, p. 11-12.

**Threshold Considerations**

Timeliness & Exhaustion of State Remedies

Respondents do not contend, and the Court does not find, that the Petition was filed outside  the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1).  Further, Petitioner no longer has any state direct review or collateral review remedies available to her with respect to the claims raised in this court; thus, her claims are exhausted for the purpose of federal habeas corpus review.

Procedural Default

Before Petitioner may seek habeas relief in federal court, she must exhaust each claim presented to the federal court by pursuing remedies available in state court.  *See Rose v. Lundy*, 455 U. S. 509, 521 (1982).  This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See   O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S. Ct. 1728 (1999); 28 U.S.C. § 2254(b) and (c).  In Maryland, this may be accomplished by raising certain claims on direct appeal and with other claims by way of post-conviction proceedings.  Exhaustion is not required if at the time a federal habeas corpus petition is filed. Petitioner has no available state remedy.  *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989).

Where a petitioner has failed to present a claim to the highest state court with jurisdiction

to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U. S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U.S.  478 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U. S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief).   The Court does not find that any of Petitioner's claims have been procedurally defaulted.

## Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings" *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).  This standard is "highly deferential" and "difficult to meet."  *Cullen v. Pinholster*, 563 U.S. __, ___, 131 S.Ct. 1388, 1398 (2011); ); *see also White v Woodall,* 2014 WL 1612424, * 4 (April 23, 2014, U.S.__, 134 S. Ct 1697, quoting *Harrington v. Richter*, 562 U.S. __, __, 131 S. Ct. 770, 786-87 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d).    A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1),    a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  "Rather, that application must be objectively unreasonable." *Id*. Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S.290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. **"[A] a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly.**" *Renico v. Lett*, 599 U.S 766, 773 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

The Antiterrorism and Effective Death Penalty Act (AEDPA) erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error ... beyond any possibility for fairminded disagreement." *Harrington v. Richter,* 562 U.S. ___, 131 S.Ct. 770, 786–787 (2011). "If this standard is difficult to meet"—and it is—"that is because it was meant to be." *Id.,* 786. A federal court reviewing a habeas petition will not lightly conclude that a State's criminal justice system has experienced the "extreme malfunctio[n]" for which federal habeas relief is the remedy. *Id.,* 786 (internal quotation marks omitted).

**Analysis**

## I.   INEFFECTIVE ASSISTANCE OF COUNSEL

When a petitioner alleges a claim of ineffective assistance of counsel, she must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires

the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors.  *Id.* at 696.   Although "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," it is equally true that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. Where circumstances are such that counsel should conduct further investigation to determine "whether the best strategy instead would be to jettison [a chosen] argument so as to focus on other, more promising issues,"  failure to conduct   further investigation can amount to constitutionally deficient assistance.  *See Rompilla v. Beard*, 545 U.S. 374, 395 (2005) (O'Connor, J., concurring).

Whether retained or appointed, defense attorneys do not have infinite amounts of money and time with which to investigate and pursue substantially all plausible lines of defense, nor is such conduct  realistic or constitutionally mandated.  *See Washington v. Watkins***,** 655 F.2d 1346, 1356 (5th Cir. 1981) ("'counsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers.'") (citation omitted).  The fact that counsel could have conducted a more thorough investigation that might have borne fruit does not establish that the attorney's performance was outside the wide range of reasonably effective assistance. *See Burger v. Kemp*, 483 U.S. 776, 794-95 (1987).  Counsel should be strongly presumed to have rendered adequate assistance and made all significant decision in the exercise

14

of reasonable professional judgment and the burden to show that counsel's performance was deficient rests squarely on the defendant. *See Burt v. Titlow*, ____ U.S. ____, 134 S.Ct. 10, 17 (2013).

Absent clear and convincing evidence to the contrary, a claim that counsel's decision was premised on trial strategy cannot be disturbed. *See Evans v. Thompson*, 881 F.2d 117, 125 (4th Cir. 1989). A defendant must overcome the " 'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.' " *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). "There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington*, 131 S.Ct. at 790 (internal quotation marks and citation omitted). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S.Ct. at 788 (internal citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

A showing of prejudice requires that 1) counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable, and 2) there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *See Strickland*, 466 U.S. at 687, 694. "The benchmark [of an ineffective assistance claim] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693.

15

Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687; *Harrington*, 131 S.Ct. at 787–88 (citing *Strickland*, 466 U.S. at 687). A determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient. *Strickland*, 466 U.S. at 697.

Using this framework, Petitioner's claims of ineffective assistance of counsel will be considered in turn.

### A.  FAILURE TO OBTAIN MENTAL HEALTH EVIDENCE INCLUDING NCR AND INTOXICATION DEFENSES:[2]

The gravamen of Petitioner's claims is that the state courts unreasonably applied *Strickland* and *Wiggins v. Smith*, 539 U.S. 510 ( 2003) (addressing capital trial attorney's duty to investigate) in light of the record. Petitioner argues that the post-conviction court applied *Strickland* and *Wiggins* in an objectively unreasonable manner by failing to conclude that trial counsel's investigation and presentation of defenses based on Petitioner's mental illnesses fell below acceptable professional norms.

Rather than focusing on Petitioner' mental health problems, counsel pursued a defense that Petitioner was not involved in the crime.  Trial counsel only mentioned Petitioner's mental health problems and the medications she was using during closing argument, whereupon the State objected to those arguments based on trial counsel's failure to have elicited facts regarding these issues during the trial.   Petitioner further maintains that after the jury rejected trial

---

[2]In post-conviction proceeding Petitioner alleged that trial counsel was ineffective for failing to investigate her history of mental illness; failing to mount  sufficient defenses to the aiding and abetting charges; failing to pursue a voluntary intoxication defense to first degree murder; allowing her to waive her right to remain silent and submit to an interview; calling Melissa Seling to testify as a defense witness; and the cumulative effect of the errors.  *Id.*, Ex. 18.  In her application for leave to appeal the denial of post- conviction relief Petitioner combined the claims regarding failure to investigate mental illness and failure to pursue a voluntary intoxication defense.  She advances this claim here.  The Court find that she has "fairly" presented the claims to the state court for review and the claims are therefore exhausted.

counsel's trial theory, he failed to investigate or pursue any basis for mitigation during the sentencing proceedings. ECF No. 1.  Petitioner maintains that these alleged deficiencies severely compromised Petitioner's defense at trial and her case in mitigation at sentencing. *Id*. Petitioner argues that the state court's adjudication of her ineffective assistance claims was unreasonable "in the same way" as counsel in *Wiggins,* 539 U.S. at 527-28 and like cases dealing with counsel's duty to investigate a defendant's mental health.

Petitioner alleges she was prejudiced by counsel's failure to use her history of mental health problems to pursue a not criminally responsible ("NCR") plea or a defense of intoxication. She asserts that she suffered from borderline personality disorder, dependent personality disorder, obsessive compulsive disorder, major depressive disorder and alcohol and drug abuse. She claims that trial counsel, who consulted with an expert on spousal abuse syndrome prior to trial and who had Petitioner evaluated by three mental health professionals (at the trial court's request) prior to sentencing, failed to adequately investigate her mental health history leading up to the murders in that he failed to secure and provide to the mental health experts records concerning mental health treatment which occurred subsequent to her marriage to BJ and prior to the murders.  The state post-conviction court rejected this claim finding:

> The Court addresses Petitioner's first allegation as to failure to investigate Erika's history of mental illness and failure to obtain records. Petitioner argues that trial counsel failed to obtain readily available documents pertaining to Erika's pre-arrest mental health and that this failure also indicated a failure to investigate Erika's mental health history.
>
> Further, Petitioner alleges the trial counsel failed to contact any physician or mental health expert to assist on the case. (Cons. Am. Pet. at 4-5.) From this, Petitioner argues that these failures prevented three separate defenses from being pursued: Voluntary intoxication as a defense, a plea of not criminally responsible, and

what Petitioner labels as a proper defense to aiding and abetting. According to Petitioner, such an investigation, if pursued, would have revealed that she was manipulated by and extremely dependent upon B.J., a former Navy SEAL, as noted earlier. Petitioner's experts at her Post Conviction Hearing testified that Erika was suffering from a host of disorders which provided potential defenses to her culpability, even as an aider and abettor. Further, these witnesses testified that evidence could offer an explanation for some of Erika's disturbing behaviors after the murders. These include her possession of the victim's property, her tattoo in the location where she allegedly stabbed or cut Ms. Crutchley, and the beach photos.

It is clear that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (*quoting Strickland*, 466 U.S. at 690-91). It is clear that "counsel must make a rational and informed decision on strategy and tactics based upon adequate investigation and preparation." *State v. Borchardt*, 396 Md. 586, 604 (2007).

Thus, the issue is whether Mr. Tuminelli's investigation of Erika's mental health history was sufficient under the circumstances. While it is clear that Mr. Tuminelli never obtained the extensive prior mental health records introduced by Petitioner at the Post Conviction Hearing, he did investigate Erika's mental health history. He knew the basics of the matters testified to at the Post Conviction Hearing without access to the records. He knew that Benjamin may have manipulated Erika, and that he may dominated her. (Tr. p. 190, lines 4-7 (Jan. 6, 2009).) Further, he "knew that she had issues in Virginia where she saw social workers and, and was told that she was taking Xanax."[5] (*Id.* at 192, lines 1-3.) As a result of that information, he hired Dr. Ellen McDaniel, an expert on spousal abuse syndrome, to interview and assess Erika to see if that spousal abuse syndrome could have explained Erika's behavior.[6] (*Id.* at 190, lines 11-15.) Mr. Tuminelli also hired a social worker to contact Erika while she was incarcerated pending trial.[7] (*Id.* at 192-193.)   Thus, despite Petitioner's claim to the contrary:

> - Mr. Tuminelli was aware of Erika's mental health issues;
> - Mr. Tuminelli contacted an expert witness with respect to spousal abuse; and

- Mr. Tuminelli had a mental health professional meet with Erika pending trial.

Mr. Tuminelli also testified that Mr. Ceraso, co-counsel, was in charge of the pretrial investigation into Erika's mental health and it was Mr. Ceraso's job to get any necessary records.[8] This assertion was not rebutted in any way. Further, Erika was unable to recall the names of many of her providers according to the doctors who prepared the evaluations ordered by Judge Dwyer prior to Erika's sentencing. (Def. Ex. 12-14.) Based on this record, this Court cannot conclude that Mr. Tuminelli was unaware of the mental health issue presented by Erika and her potential defenses despite the lack of the records.

Based on the above, the Court finds that Mr. Tuminelli's investigation of Erika's prior mental health issues was adequate. Erika's claim of ineffective assistance of counsel on this ground is **DENIED**.

As noted above, petitioner alleges that the failure to obtain mental health records presented the presentation of "other critical defense." She identifies two: A plea of not criminally responsible and a defense to aiding and abetting.

## B. NCR Plea

The failure to pursue a NCR plea is the Petitioner's contention that counsel was ineffective in not pursing a plea of not criminally responsible to the charges at issue, and that this constitutes ineffective assistance of counsel. First, the Court recognizes that a competent Defendant has the ability to decide whether to pursue such a defense. *See Treece v. State*, 313 Md. 665, 681 (1988). It is clear from Mr. Tuminelli's testimony that such a plea was considered and rejected after discussion with Erika and her parents.[9] Mr. Tuminelli testified that Erika insisted on her innocence in this case.[10] While offering inconsistent theories can be a valid defense strategy, the assertion of the lack of criminal responsibility could conflict with the strategy ultimately chosen by counsel. (Tr. Pp. 197-98 (Jan. 6, 2009)); *see also Treece*, 313 Md. at 677 (finding that "the assertion of the defense of lack of criminal responsibility may well produce conflict with a defense on the merits"). Mr. Tuminelli was concerned with the possibility of Erika's statements being presented to the jury (*Id*. at 196, lines 2-4), and feared Erika's evaluation by a state mental health expert.

*See* Md. Ann. Code, Criminal Procedure, 3-111 (2008 Repl. Vol.) In light of Erika's inconsistent statement to her involvement with the murders, these were not unreasonable concerns.

Further, there is no evidence that Erika would have considered a plea of not criminally responsible.  No one testified that, given the options, she would have elected such a plea.   While Petitioner argues that the experts' opinions as to her mental illness would have, in all likelihood garnered a different and more favorable result, this Court is not so convinced, nor was Mr. Tuminelli, particularly if any of Erika's statements would have been presented to a jury.[11]

Mr. Tuminelli pointed to evidence that could be construed as inconsistent with Erika's alleged mental disorders. These behaviors included Erika's possessing the shell casings and the victim's identification after the murders;[12] Erika's telling B.J. to just to go ahead and shoot the victims when they were in the condominium (Def. Ex. 18, p. 5); and Erika's implicating B.J. in the homicides shortly after her arrest at Hooters (*see Sifrit*, 338 Md. at 85).[13] Further, the fact that Erika implicated B.J. in the homicides even while she was exchanging letters with him would be inconsistent with the diagnosis of Dependant Personality Disorder according to Dr. Bloomberg. (Tr. p. 78, lines 10-20 (Jan. 7, 2009).)

## Voluntary Intoxication Defense

Petitioner next argues that Tuminelli was ineffective for failing to offer a voluntary intoxication defense to the first degree murder charge.[14] Petitioner argues that trial counsel failed to investigate "Ms. Sifrit's use and abuse of Paxil, Xanax, alcohol, and/or other substances" and this refusal amounted to ineffective assistance. (Cons. Am. Pet. p. 8.) Petitioner's counsel emphasized that even though Tuminelli asked the jury in his closing argument to take notice of the affects of Xanax and Paxil, he never presented evidence on that issue. (Cons. Am. Pet., p. 6.)

It is not disputed that, at the time including and surrounding the murders, Erika was consuming alcohol, Paxil and Xanax. In fact, when she was arrested at Hooters, she asked an officer to search her purse for her pills. It was during this search that the police found evidence linking Erika and BJ to the murders.

Petitioner fails to argue how such evidence could have been presented to the jury. Erika's multiple statements to police, beginning the night she was arrested, show that [she] had a clear, cogent memory of events. Absent Erika's own statements, there is no other evidence proffered that could show her level of intoxication that night. Therefore, in order to show the requisite level of intoxication, Erika would probably have been forced to testify. Again, this could have opened the door for the admission of her statements that were initially suppressed. Mr. Tuminelli was concerned about that probability, and that concern is not an unreasonable one.

Further, Petitioner's post-conviction experts differed on this issue. Smith found that it impaired her mental state (Def. Ex. 3), while Blumberg found that the alcohol and drug use had no effect (Def. Ex. 11). In light of this, Tuminelli's decision to not put on medical evidence of the affects of Xanax and alcohol was clearly reasonable.

Finally, after concluding that Tuminelli made a strategic defense decision after reasonable investigation, pursuing this defense would have been blatantly contradictory to that strategy. In arguing that it was BJ who committed the murders, Tuminelli risked confusing the jury if he also argued that Erika did it but was inebriated. Therefore, Tuminelli was neither deficient nor prejudicial in not pursuing this defense.

_____

[5] Erika's statements to police in the days immediately following their arrest may have also tipped Tuminelli to pursue an investigation. *(See generally* Def. Ex. 15 (Interview with police the night of her arrest at Hooters); Def. Ex. 17 (Second interview with police on June 24th)) Tuminelli's understanding of Erika's relationship with BJ is evident in the June 24th police interview. (Def. Ex. 17, pp. 135-36.)

[6] McDaniel reported back to Mr. Tuminelli that there were indications that Erika did in fact suffer from the syndrome, but that she was also troubled by Erika's incriminating statements to the Secret Service in her pre-polygraph interview. (Tr. pp. 190-191(Jan. 6, 2009).)

[7] Mr. Tuminelli explained that the social worker "thought Erika was distraught and, and that, ah, and that was understandable under

the circumstances. She was sitting in jail charged with a double murder. But there was no hint, or, or suggestion that Erika had, you know, severe psychological problems other than her situation, she's sitting in jail." (Tr. p. 193, lines 1-6 (Jan. 6, 2009).)

[8] Mr. Ceraso did not testify at the post-conviction hearing. Additionally, to the extent that Petitioner argues that Mr. Tuminelli should have been in charge of the investigation, "[i]t is well-settled counsel may rely on the efforts of co-counsel, investigators, and experts in preparing for trial ..." *Wilson v Sirmons*, 536 F.3d 1064, 1136 (10th Cir. 2008) (*citing Clark v Mitchell*, 425 F.3d 270, 286 (6th Cir.2005)).

[9] Mr. Tuminelli testified that he had "every reason to believe that Erika, and more importantly her parents, would not, would have fought me vigorously in terms of you can't have Erika admit that she knowingly participated in these murders, but her will and her volition was over --- overwhelmed by Benjamin. I don't think that, from a practical point of view they would want to hear that." (Tr. p. 193, lines 18-24 (Jan. 6, 2009).) After choosing the strategy that "Erika was at best an accessory after the fact by participating and disposing of the bodies," he "ran it past the Graces, Erika Sifrit and Tom Ceraso." (Id. at 184, lines 22-25).

[10] At the same time as he was negotiating the agreement, Erika was giving a consistent version of events to Mr. Tuminelli, explaining that BJ had committed the murders and she had only helped dispose of the bodies. In fact, she had already given a similar statement to the police. (*Id.* at 166, lines 7-18; Def. Ex. 15 (Erika indicates she was "20+ feet" away from BJ when he shot them).) In preparation for her interview with police on June 24th, Mr. Tuminelli discussed the case with Erika who again maintained that "she did not participate in the murders and didn't know it was gonna happen until it happened." (*Id.* at 168-169.) In that interview "she told essentially the same story again," that "she was downstairs when the shots occurred and that she did what she could to prevent it." (*Id.* at 170, lines 2-5; Def. Ex. 17 at 53-54.) In addition to Erika's statements, her father "was assuring [Tuminelli] that Erika was telling [Tuminelli] the absolute truth." (*Id.* at 172, lines 1-2.)

[11] At the suppression hearing, Judge Dwyer ruled as inadmissible inculpatory statements Erika made to Detective Bernal after her arrest and prior to Mr. Tuminelli's appearance. He found that these

statements were made in the course of a plea agreement with the State, where they would drop the burglary charge in exchange for Erika leading police to the bodies. Additionally, per the MOU, the State could not use Erika's statements to the Secret Service during the pre-polygraph. In essence, then, the only statements that were admissible against Erika were the statements she made during her arrest at Hooters.

[12] The court recognizes Dr. Blumberg's testimony that "the collecting kinds of behavior would be very consistent with her OCD," (Tr. p. 62, lines 8-18 (Jan. 7, 2009), but also notes that the fact that she had the shell casings in her possession could be construed, by the jury, as inconsistent with her disorders.

[13] Additional examples of Erika exercising control in the relationship are found in her own statement to Det. Bernal. In that interview, Erika admits that she: refused to take BJ's pictures holding the heads of the dismembered bodies; refused to cook and eat a leg after the murders; refused to help him put the bodies in the dumpster; refused to help him move a bag with a torso; refused to look at the dead bodies when he calls to her after the murders; ordered him to clean up the blood; continued to take photographs in the days following the murders; and refused to help BJ kill her family and abscond with their money. (*See generally* Def. Ex. 17.) Additionally, Erika told Mr. Tuminelli that it was her idea to break into the Hooters that weekend, not BJ's. (Tr. p. 197, lines 1-4 (Jan. 6, 2009).)

[14] "Although voluntary intoxication does not excuse murder, it may downgrade murder in the first degree to murder in the second degree." *Hook v. State*, 315 Md. 25, 29 (1989). This is because "[i]ntoxication can negate any specific intent including specific intent to kill and the specific intent to inflict grievous bodily harm. However, in murder, such conduct demonstrates the degree of consciousness of risk that establishes depraved heart murder, which is a general intent crime." *Bey v. State*, 140 Md.App. 607, 631(2001) (*citing Cirincione v. State*, 75 Md.App. 166, 170 n.1 (1988)).

ECF No. 1, Ex. 1, p. 12-18.

The state court's determination survives review.  Petitioner is unable to demonstrate

either deficient performance on behalf of her trial counsel or prejudice arising from her counsel's

alleged inadequate investigation into her mental health status. Petitioner presents no evidence that she would have considered an NCR plea or a defense of voluntary intoxication. Trial counsel testified that Petitioner, who was competent to participate in her own defense, would not have pursued any defense which indicated her direct participation in the murders. Further, counsel's opinion was that both NCR and voluntary intoxication were not viable defenses in Petitioner's case. Tuminelli testified that the defense team wished to avoid any defense which directly implicated Petitioner in the murders and which might have resulted in the admission of Petitioner's inculpatory pretrial statements which trial counsel was successful in having suppressed. *Id*. It is clear that pursuit of such a line of evidence was at odds with the Petitioner's own version of events and her defense that she did not participate in the homicides. *Id*., Ex. 19, p. 163-249.

Additionally, psychiatric assessments obtained prior to trial and again prior to sentencing did not provide any basis for pursuing an NCR defense. Dr. Katz reviewed Petitioner's personal and mental health history and interviewed her in order to determine whether the criminal conduct was occasioned by "Mental Disability, Emotional Disturbance, or Substance Abuse." He concluded that "the psychological factors cited above, need for perfection and depressive symptoms do not account for the actions related to the current offense. Ms. Sifrit was realistically aware of the events taking place around her, and by her own report did make decisions that were deliberate. Further, by her own report, her use of alcohol and Xanax at the time of the current offense, did not impair her ability to realistically perceive her environment, or make decisions that were deliberate." *Id*., Ex. 27. In the same vein, Dr. Stephen Curran concluded that while Petitioner suffered from "personality deficits and significant patterns of

substance abuse," she did not present with "major psychiatric conditions." *Id.*, Ex. 28.  Dr. Diane Gutterman also concluded that there was "no evidence of a major psychiatric illness." *Id.* Ex. 29. In consulting with these experts, Petitioner was unable to provide identifying information of the mental health providers she consulted after her marriage to BJ and prior to the murders.  At the time Petitioner was preparing for trial and sentencing with counsel, there was simply no evidence demonstrating that Petitioner met the criteria for an NCR or voluntary intoxication defenses or that further inquiry into her limited mental health records was necessary.

Under *Strickland*, counsel is permitted to "make a reasonable decision that makes particular investigations unnecessary." *Strickland* 466 U.S. at 691.  Here, a reasonable attorney could decide to forgo further inquiry into Petitioner's competency or the defense of voluntary intoxication based upon the determinations of the experts consulted, as well as Petitioner's repeated contention that she was not directly involved in the homicides. "Counsel [is] entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at ___, 131 S.Ct. at 789.  "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Id.*, at 790.  Here, counsel had reason both to question the plausibility of an NCR or voluntary intoxication defense in light of Petitioner's contention that she was not directly involved in the murders, and also in light of the effort to keep from the jury her numerous inculpatory statements. The Court is unpersuaded that counsel's investigation was below par.  Counsel cannot be faulted for failing to pursue additional defenses in light of the expert opinions regarding Petitioner's competency presented during the pretrial and

presentencing proceedings, notwithstanding that those experts did not have access to Petitioner's full mental health records.

Further, counsel's theory of defense, that Petitioner was uninvolved in the crime rather than intoxicated, provided Petitioner a chance for complete acquittal, rather than merely reducing her exposure to the degree of murder. The selection of this theory of defense was clearly tactical. A tactical decision not to further investigate or pursue an involuntary intoxication defense is entitled to deference and cannot be second guessed. The pursuit of a defense that Petitioner was not involved in the murder, even at the expense of other defenses, was reasonable under the circumstances. *Strickland*, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsels' assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). The Court declines to second-guess counsel in this regard.

The post-conviction court's findings are objectively reasonable given the testimony put forth at the post-conviction hearing, and are supported by the trial and post-conviction transcripts. The post-conviction court considered the testimony of the experts regarding Petitioner's competency at the time the crimes were committed, as well as their findings regarding the effect of her drug and alcohol use at the time of the crimes. Although the post-conviction experts had access to Petitioner's complete mental health records, the post-conviction court was unpersuaded that Petitioner had shown either ineffective assistance of counsel in his investigation of the case or his handling of the trial. The state court also found Petitioner failed to demonstrate prejudice arising from counsel's failure to secure the mental health records. The

findings are objectively reasonable and are deemed presumptively correct, pursuant to 28 U.S.C. §2254(d) and (e).

Even if the undersigned found trial counsel's conduct to be deficient, Petitioner would be entitled to no relief. "The pivotal question [in a § 2254 petition] is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id*. at 785. There is simply no indication that the post-conviction court's determination "was so lacking in justification that there was an error...beyond any possibility for fairminded disagreement." *Harrington* 562 U.S. 86, ___131 S.Ct at 786-87 (2011). As noted above, the state post-conviction court identified the appropriate federal law as established by the Supreme Court for determining ineffective assistance of counsel claims and applied same in a manner that was not contrary or unreasonable to that Supreme Court precedent.[3] In light of the record, there is no basis to find that the state court's determinations were unreasonable on the facts or on the law. There is no cause to disturb the post-conviction court decision under § 2254(d).

## B.   TESTIMONY OF MELISSA SELING

Petitioner maintains that trial counsel was ineffective in calling Melissa Seling as a defense witness to testify that Petitioner protected Seling from Benjamin Sifrit when he threatened Seling with a handgun. ECF No. 1, Memorandum at 46. In reviewing this claim, the post-conviction court found trial counsel's strategy was sound. Seling was called in order to

---

[3] The state court properly applied *Strickland*. Further, it is not apparent that *Wiggins* was controlling as to the investigation required in Petitioner's case. *Wiggins* arose in a death penalty case during sentencing proceedings. The Supreme Court has not applied *Wiggins* outside of the context of investigating mitigating evidence to be used in death penalty cases. Petitioner cites to numerous circuit court cases extending *Wiggins* to a general duty to investigate. However, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.' 28 U.S.C. §2254(d)(1). It therefore cannot form the basis for habeas relief under AEPA." *Parker v. Matthews*, ___ U.S. ____, 132 S.Ct. 2148, 2155 (2012).

support an inference that Benjamin acted unilaterally in the killings.   The post-convict court held:

> As discussed above, Seling was called by defense counsel. She testified that just a few days after the murders, the Sifrits played what was described as the "purse game," where Erika claimed that her purse was missing as the couple threatened Seling and her friend for having "stolen" the purse. The State's theory was that this is the scenario that played out the night of the murders. By calling Seling, a witness on the State's list, the defense allowed this theory to be before the jury without the State having to put on such evidence. According to Petitioner, "[i]f the defense had not called Ms. Seling as a witness, the jury would not have had any evidence of the alleged 'purse game,' and the jury would not have been aware of any of the similarities between these two encounters." (Cons. Am. Pet. at 13.)

> "[T]he question of whether to call a witness is a question of trial strategy ordinarily entrusted to counsel; therefore, we afford trial counsel's decision ... great deference." *State v. Borchardt*, 396 Md. 586, 614 (2007). "Strategic decisions must nonetheless be supported by reasonable professional judgment." *Walker v. State*, 391 Md. 233, 260 (2006) (*citing Strickland*, 466 U.S. at 690). Based on this standard and the following discussion, the Court finds that Tuminelli exercised reasonable professional judgment in calling Seling, and therefore his performance was neither deficient nor prejudicial.

> The decision to call Melissa Seling as a witness must be viewed in light of the entire trial. As discussed, Tuminelli and Ceraso decided on a defense strategy that would prove BJ was the perpetrator of the crimes. In his testimony, Mr. Tuminelli summed up the State's evidence and concluded "that there was no evidence that, that pointed to exactly ... what occurred in that apartment." (Tr. p. 183, lines 19-20 (Jan. 6, 2009).) In fact, "there was really no evidence of what [Erika] did and what Benjamin did and there was clear evidence that in my opinion that Benjamin had to be the person who shot these victims because ... the door was kicked in to the bathroom. It was ... pretty clear that Erika didn't kick that door in." (*Id.* at 184, lines 13-19.) To that end, they basically pursued the same avenue that the State did in prosecuting BJ prior to Erika's trial. First, the defense called Michael McInnis, a former Navy SEAL teammate of BJ who had separated from his wife and

moved in with BJ for a time in 1999. (Tr. Vol. 6, p. 19, lines 14-25 (June 6, 2003).) That same year, McInnis and BJ had a conversation about McInnis' wife where BJ offered to kill her for $30,000. (*Id.*, p. 22, lines 4-24.) In that same conversation BJ described to McInnis how he would dispose of a body if needed:

Q: If he ever needed to eliminate a body, what did he say he would do?
A: He would lay down plastic on the floor and then cut off the arms and legs and then eliminate the body in a dumpster.
Q: How about the head?
A: Head.
(*Id.*, p. 23, lines 8-14.)

Mr. Tuminelli then called Lawrence Hartman who testified that he sold what was determined to be the murder weapon to BJ. (Tr. Vol 6, pp. 80-91 (June 6, 2003).) He then read into the record portions of BJ's testimony at his own trial where he admitted to dismembering the bodies and disposing of them in the same manner as described to McInnis in 1999:
Q: Now, after you dismembered the bodies and put them into plastic bags, what did you do with them?
A: Threw them in a dumpster.
(*Id.*, p. 112,, lines 14-17.)

Defense called Seling to further bolster this testimony by showing that the night Seling went to the condo, it was BJ who was the aggressor. Seling had given a statement to police a few weeks after the murders where she described her experience with the Sifrits. When it was noticed that the purse was missing, Seling told police that "he kept putting his hand on the gun and he's got to find that purse ..." (Def. Ex. 20, p. 5.) Later, "BJ was kind of going a little bizerk (sp) in the living room, and at this point he had the gun out in his hands and was waving it around ... he made some connotation to that the fact that two people had been, a couple that they had brought over to their place to hang out with them a few days ago had ripped them off and that he shot them and killed them, and he was like, you know, I'll do it again if need be ..." (*Id.* at 6.) According to Seling, "he said people, people shouldn't be going around ripping off other people ... the earth doesn't need that, those kinds of bad people wondering around, so I just did the earth a justice and got rid of those bad people." (*Id.* at 16.) Her testimony at BJ's trial was similar.[18] (See generally Def. Ex. 21, pp. 116-118.)

Mr. Tuminelli testified that he hoped that Seling's testimony would cast enough doubt on the State's evidence. In essence, Seling was his aiding and abetting defense. (Tr. p. 185, lines 4-13 (Jan. 6, 2009).) In reviewing her testimony at BJ's trial, Mr. Tuminelli found that the comments by BJ were inculpatory as to him, and not Erika. (*Id.* at 186, lines 14-21.) Mr. Tuminelli called her so she could produce the same testimony — namely showing the jury that it was BJ, and not Erika, who committed the murders. This decision would be consistent with his overall trial strategy of showing BJ as the murderer.

Seling's recollection of the incident also tended to show that Erika was not complicit in the Seling incident. She testified at BJ's trial that Erika asked BJ to put the gun away and he did.[19] Mr. Tuminelli was hoping that the jury would infer that Erika asked the same thing the night of the murders but BJ, for whatever reason, decided not to acquiesce. (*Id.* at 202, lines 20-24.) Petitioner argues that the jury could have, and probably did, make a different inference from her testimony — that Erika, with knowledge of what happened a few nights previous, was a willing participant in asking Seling and her friend back to the apartment and playing the "purse game." Instead of showing that BJ was the only killer, as the defense had hoped, her testimony "opened the door for the State to argue that the only difference between the Seling encounter, and the earlier murders, is that Ms. Sifrit did not want the first crime to stop." (Cons. Am. Pet. at 14.)

Petitioner is probably correct that the jury made the opposite inference than Tuminelli had hoped. That does not mean that his decision was unreasonable. This decision must be given great deference. Viewing the trial as a whole, Mr. Tuminelli really had no other option. The other possible aiding and abetting defense, Erika's mental health history, was considered and dismissed as trial strategy based on Mr. Tuminelli's discussions with Erika, the Grace's, and his co-counsel. His only way to establish such a defense then was to call Seling to show that Erika was not complicit in either event. Seling's testimony provided his only plausible strategy to combat the aiding and abetting charge.

Petitioner cannot complain that an appropriate aiding and abetting defense was not presented. First, as stated, it is clear to the Court that it was her wish not to pursue a plea of NCR. Second, because such a plea would not be pursued, Seling represented the best way

to defend against the charge of aiding and abetting. Therefore, her claim that the calling of Seling was ineffective assistance does not persuade this Court. Relief on this ground is **DENIED**.

_____

[18] At BJ's trial, defense counsel pointed out that at one point in her interview with police, Seling indicated "What he was waving around the gun and making connotations to the people that they murdered, ah, I'm not sure if it was he murdered, or she murdered, or they both, you know, murdered them."
(See Def. Ex. 20, p. 18); (Def. Ex. 21, pp. 146-151.)

[19] "Q: And what did she do?
A: And she went outside and she was like BJ, do you think you can put that gun away very nonchalant like it was nothing for him to be holding this gun like this.
Q: Did he do so?
A: He never really put it away. He just kind of put it back in his pants, you know."
(Def. Ex. 21, p. 117, lines 17-23.)

ECF No. 1, Ex 1, pp 20-24.

Trial counsel's decisions regarding which witnesses to call at trial are entitled to substantial deference under *Strickland*. *See Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991) (choice of witnesses is a tactical decision to be made by trial counsel). The post-conviction court's review of the decision to call Seling as a witness for the defense is supported by the record and shall not be disturbed. *See* 28 U.S.C. §2254(d).  That the jury was not persuaded by Tuminelli's inference, offered through Seling's testimony, that Benjamin was solely responsible for the murders does not render the decision to call Seling ineffective.  Under the deferential standard accorded to state court rulings on federal habeas review, the state court's rejection of this ineffective assistance of counsel claim constituted a reasonable application of *Strickland*. *See* 28 U.S.C. § 2254(d). The post-conviction court's determination will not be disturbed.

### C.      PRETRIAL INTERVIEW WITH SECRET SERVICE

Petitioner alleges that Tuminelli was ineffective in having her waive her right to counsel and submit to a pretrial interview with the Secret Service. ECF No. 1, Memorandum pp. 44-45. Petitioner argues that Tuminelli "misunderstood the terms of the [memorandum of understanding] and mistakenly believed that, so long as Petitioner passed the polygraphs she would not be charged with murder, regardless of her admissions concerning her role in the murders." *Id.*, at 44.   Petitioner argues that trial counsel lacked experience with polygraph examinations at the time he negotiated the MOU and she further argues that she received constitutionally inadequate advice regarding the MOU.  She states that her disqualification from and deprivation of the benefit of the MOU would not have occurred and she would not have been prejudiced if counsel had properly advised her that if she waived her right to remain silent and that by admitting involvement in the murder she would lose the benefit of the bargain.  *Id.*

The Court finds, contrary to Respondent's assertion, that this claim was fairly presented to the state court and is therefore exhausted. The Court will therefore consider the merits of the claim.

The state post-conviction court rejected Petitioner's ineffective assistance of counsel claim arising from the MOU and the agreed upon polygraph interview finding:

> As recounted in the facts, prior to submitting to the agreed-upon polygraph, Erika made inculpatory statements in the pre-polygraph interview that showed she had prior knowledge of the murders,[15] instigated BJ to shoot the victims,[16] and cut Crutchley.[17] At that point, the State claimed that she had breached the MOU, and proceeded on prosecuting her for the murders.
>
> The short answer to this contention is that Petitioner cannot show any actual prejudice as a result of the alleged breach. None of the statements were admitted against Erika; no evidence was

discovered as a result of the interview. She did end up being prosecuted, but the charges had already been initiated. The detriment was akin to a loss of prospective advantage: she lost the opportunity to walk away from murder charges that were already pending.

The Court finds that it was reasonable for Mr. Tuminelli to advise Erika to enter into the agreement and submit to an interview, even out of his presence. Prior to the interview, Erika maintained her innocence. Based on that representation, then in advising her to enter into the agreement was reasonably competent advice.

The polygraph was a no-lose situation and therefore was not prejudicial. The result of the interview was that the State continued proceedings against Erika. Whether she incriminated herself or refused the polygraph altogether, the result would have been the same — state prosecution. If she submitted and tested not deceptive, there would be no prosecution. The agreement represented the best possible outcome for his client under the circumstances presented to Mr. Tuminelli. The Court finds that advising Erika to submit to the interview was not ineffective assistance of counsel. Therefore, the petitioner is DENIED relief on this ground.

_____

[15] Special Agent Carrie Campbell of the U.S. Secret Service was tasked with administering the pre-polygraph interview and polygraph examination of Erika. After Erika incriminated herself in the interview, the exam was discontinued. Special Agent Campbell prepared a report summarizing Erika's statements, which was submitted as Defendant's Exhibit 18 at the post conviction hearing. The memo recounted the following exchange regarding her prior knowledge: "Mrs. Sifrit stated that she yelled for BJ to come upstairs. BJ and Martha immediately came upstairs. Mrs. Sifrit said, 'BJ, my shit is missing!' She said BJ became very angry and claimed his gun was missing too. BJ yelled, 'Where's our shit?' Did you fucking take our shit?' BJ then asked Mrs. Sifrit to give him her gun. She just stood there but BJ grabbed it right off the shelf near the headboard of the bed. When he took the gun Mrs. Sifrit told us, 'I knew he was going to kill them.' Secret Service Memo, pp. 4-5.

[16] "BJ continued to point the gun at them and told them to 'get in the bathroom.' ... Mrs. Sifrit said they were 'yelling and pleading for their lives.' She told BJ she just called 911 and he got very

33

mad. BJ said, 'What the fuck are we supposed to do now? Am I supposed to ...? I'm just going to fucking waste them? Cool?' ... She said the statement was made with a 'question mark.' Mrs. Sifrit was very clear in saying he was definitely asking me in a question, only he didn't say should I? ... Mrs. Sifrit stated she told BJ to 'just fucking do it! You got them naked, you put a gun to their heads, just do it!' After she told us that she had said 'just fucking do it!' she stopped for a minute during the interview and said, Now you have me on murder.' I asked Mrs. Sifrit what she meant by 'just fucking do it' and 'just do it' and she continued approximately ten times and her answer was always the same, 'I meant kill them, I knew he wanted to.' *Id.*, at 5.

[17]"She stated BJ said 'Baby, open your knife like I taught you. Get down there and check her to see if she's dead. Get down there and make sure ...' Mrs. Sifrit said, 'But I thought you said she ...' and Mrs. Sifrit walked over to Martha who was huddled in the fetal position under the vanity and began to 'cut on her body.' ... She showed us the right side of her abdomen above her right hip as the location she cut. She said, 'I was surprised how much pressure it took to cut the skin since I had never cut someone before. I cut her twice like this.' Mrs. Sifrit showed us how she held the knife and cut Martha. After saying 'I cut her twice' she stopped and said 'now you have me on murder." *Id.*, at 5-6.

ECF 1, Ex. 1, pp. 18-20.

The post-conviction court's ruling was not an unreasonable application of any clearly established Supreme Court precedent. Apparently, believing his client's representations that she did not participate in the murders of the victims, and Erika's father's assurance that she was telling the truth, Tuminelli counselled Petitioner to participate in the interview. If she passed the polygraph and demonstrated she had nothing to do with the murder she would have avoided the murder trial. However, before the polygraph had even begun Petitioner implicated herself in the murders thus voiding the MOU. *Id.*, Ex. 19, p. 205. In negotiating the MOU, which was entered to close in time to Petitioner's arrest on the murder charges, while the State was still searching for the bodies, Tuminelli was able to secure protection for Petitioner from the death penalty as

well as a guarantee that the state would not seek a sentence of life without parole.   The uncontradicted testimony offered during the post-conviction proceedings was that Petitioner, along with her family, desired for her to cooperate and take the polygraph test, given that she maintained her lack of participation in the murders.  The MOU gave Petitioner an opportunity, based on her assurances that she had nothing to do with the murders, to avoid prosecution. Additionally, after the MOU was voided, Tuminelli was able to insure that none of the inculpatory statements made by Petitioner could be used against her.

In light of the foregoing, there is simply no indication that Tuminelli's performance was deficient.  As noted by the state court, Petitioner has failed to establish prejudice.  Had Petitioner invoked her right against self incrimination and not submitted to the pretest interview, the polygraph test would not have been administered and the MOU voided—the same result that actually occurred.  Petitioner has offered no scenario which would have changed the result of the negotiations regarding the MOU and is unable to demonstrate harm from the advice of counsel as her statements were not introduced at trial.  The state court properly applied *Strickland* to the facts alleged regarding the MOU. For these reasons the Court concludes the state court's determination was neither "contrary to or involved an unreasonable application of clearly established Federal Law, as determined by the Supreme Court," nor based on an "unreasonable determination of the facts in light of the evidence presented at the State court proceeding." Habeas relief will be denied as to this claim.

### D. CUMULATIVE ERROR

Pursuant to the cumulative error doctrine, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a

single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990); *see also United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002); *United States v. Basham*,  561 F.3d 302, 330 (4th Cir. 2009).

Generally, if a court "determine[s] ... that none of [a defendant's] claims warrant reversal individually," it will "decline to employ the unusual remedy of reversing for cumulative error." *United States v. Fields*, 483 F.3d 313, 362 (8th Cir. 2007). To reverse for cumulative error, the errors must  "so fatally infect the trial that they violated the trial's fundamental fairness." *Basham*, 561 F.3d at 330 (quoting *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004)). When "none of [the trial court's] individual rulings worked any cognizable harm [on the defendant],....[i]t necessarily follows that the cumulative error doctrine finds no foothold." *United States v. Sampson*, 486 F.3d 13, 51 (1st Cir. 2007).  In the Fourth Circuit, the cumulative error doctrine is not generally recognized because "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of all of counsel's actions deemed deficient."  *Fisher v. Angelone*, 163 F.3d 835, 852 n. 9 (4th Cir. 1998); *see also Arnold v. Evatt*, 113 F.3d 1352, 1364 (4th Cir. 1997); *Higgs v. United States*, 711 F. Supp. 2d 479, 552 (D. Md. 2010) (in the context of collateral review, review based on the cumulative effect of errors is available only where individual constitutional errors are found).

In declining Petitioner's cumulative error claim, the post-conviction court found that,

> "Even when individual errors may not be sufficient to cross the threshold, their cumulative effect may be." *Bowers*, 320 Md. at 436; *See also Cirincione v. State*, 119 Md.App. 471, 506 (1998) ("Even when no single aspect of the representation falls below the minimum standards required under the Sixth Amendment, the cumulative effect of counsel's entire performance may still result

in a denial of effective assistance"). "As ever, the touchstone is whether, in view of all the circumstances, our confidence in the result has been undermined by counsel's failings." *Cirincione*, 119 Md.App. at 506.

"In assessing the overall trial performance, therefore, we will aggregate all the errors or lapses that may be found to have occurred." *Schmitt v. State*, 140 Md.App. 1, 46 (2001). "We do not, on the other hand, aggregate mere allegations of trial error." *Id.*

Here, counsel's trial performance is directly contrasted by the performance in *Bowers* and this Court has found no errors. Mr. Tuminelli pursued a defense that matched his client's wishes. Having found that no allegation rose to the level of deficiency of performance or prejudice, there is nothing for the court to aggregate. Four times nothing is nothing. *See Gilliam v. State*, 331 Md. 651, 685-86 (1993); *Schmitt*, 140 Md.App. at 47. Therefore, relief on this ground is **DENIED**.

ECF 1, Ex. 1, pp. 24-25.

The Petitioner does not demonstrate the state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C § 2254(d). For this reason, the claim provides no grounds for federal habeas corpus relief.

In summarizing Petitioner's ineffective assistance of counsel claims, even assuming that defense counsel's alleged failures were unreasonable, Petitioner has failed to offer sufficient evidence that but for counsel's alleged error, the outcome of her trial would have been different. Having examined the post-conviction court's rulings and  having independently examined the record, this Court is satisfied that applying the *Strickland* standard to the instant allegations of trial counsel's allegedly deficient performance, Petitioner has not demonstrated the prejudice

necessary to establish counsel's ineffectiveness.   *See* 28 U.S.C. § 2254(d); *see Stamper v. Muncie*, 944 F.2d 170, 178 (4th Cir. 1991) (challenge to counsel's trial decisions and/or tactics amounted to no more than "Monday morning quarter-backing."). Further, as previously noted, Petitioner has failed to show that the post-conviction court's application of *Strickland* to the facts of her case was unreasonable. *Harrington* 131 U.S. at 785.  Accordingly,  Petitioner's claims of ineffective assistance of counsel are denied.

## II.    BREACH OF THE MOU

The Court of Appeals thoroughly considered and rejected Petitioner's claim that the state breached its MOU, finding as follows:

> It is clear that Erika breached the agreement because her preliminary statements to the polygraph examiners constituted "prospective reliable inculpatory statements."[15] Therefore, it is equally clear, from the plain language of the agreement, that Erika failed to comply with Paragraph 2 of the agreement and that, as a result, the agreement became "null and void," pursuant to Paragraph 6 of the agreement. Erika's argument that the State made it impossible for her to comply with the agreement by refusing (after hearing her inculpatory statements) to conduct the polygraph exam is, thus, specious. In fact, Erika made it impossible for the State to continue to honor the agreement by her own actions. To argue that the State "had an absolute obligation to afford her the opportunity to take a polygraph examination" after Erika, of her own accord, unexpectedly confessed to direct participation in the murders, is untenable. Consequently, the cases cited by Erika regarding not permitting the State to repudiate its agreements are unavailing.[16] The State in this case did nothing to prevent Erika from complying with the agreement. Rather, Erika voluntarily made inculpatory statements after the signing of the agreement, rendering the agreement null and void and releasing the State from its promise not to prosecute her for homicide.
>
> In order to support our holding that the Circuit Court did not err by finding that Erika made inculpatory statements, rendering the agreement null and void, it is appropriate that we discuss the

preliminary statements made by Erika to the polygraph examiners.[17]

On July 23, 2002, Secret Service Special Agents met with Erika at the Ocean City Police Station to administer a polygraph examination. Prior to the examination, the Special Agents gave Erika the *Miranda* warnings and informed her that the polygraph examination was a voluntary process.

After escorting Erika to the examination room, the Special Agents began the polygraph pre-test interview. At that time, a standard U.S. Secret Service medical questionnaire was completed, followed by a U.S. Secret Service history questionnaire. While completing the questionnaires, Erika, "talked about her life before being married and then began to detail the relationship between she and her husband, Benjamin Sifrit."

Erika then began to describe in great detail the events of the evening of May 25, 2002. Erika stated that she and her husband were vacationing in Ocean City, Maryland, when they met another couple, Joshua Ford and Martha Crutchley, while boarding a bus on their way to Seacret's nightclub. After hanging out all night at the club with Mr. Ford and Ms. Crutchley, both couples decided to go "party" back at the Sifrits' condominium at 1:30 a.m., now the morning of the 26th. They took a bus to the Atlantis (where Mr. Ford and Ms. Crutchley were staying) to pick up swimsuits and then the four of them walked on the beach to the Sifrit's condominium.

Erika stated that Joshua, Martha, and Benjamin stayed on the beach and that she went into the condominium to get beers for everyone. Once inside the Sifrits' penthouse unit, she noticed that her purse was on the back of the couch and not where she had originally put it. She stated that her jewelry and pills were missing so she called 911 to report that there were, "intruders in my house and my stuff is missing." According to Erika, she hung up on 911 when Josh came upstairs. She yelled for Benjamin to come up. Erika and Benjamin then accused Joshua and Martha of taking their things and Benjamin grabbed Erika's gun and pointed it at Joshua and Martha. Erika stated that when Benjamin took the gun, she "knew he was going to kill them." Benjamin told them to take off their clothes. The victims complied and, according to Erika, asked Benjamin and Erika why they were doing this and said that they did not take any of the Sifrits' things.

According to Erika, Benjamin continued to point the gun at the victims and told them to "get in the bathroom." Joshua and Martha locked the door behind them and were "yelling and pleading for their lives." Erika stated that Benjamin asked her, "I'm supposed to fucking waste them? Cool?" The narrative continues as follows:

Mrs. Sifrit said they were, "getting very loud and I just wanted them to shut up." Mrs. Sifrit said she was worried about the police coming and people out on the beach hearing them. She stated she could hear Martha yelling "help me, help me, help me!" and banging against the glass on the bathroom window. She stated she could hear Josh pounding on the bathroom door and yelling "Why are you doing this!" over and over.

Mrs. Sifrit stated she told B.J. to, "Just fucking do it! You got them naked, you put a gun to their heads, just do it!" After she told us that she had said, "Just fucking do it![,]" she stopped for a minute during the interview and said, "Now you have me on murder." I asked Mrs. Sifrit what she meant by, "just fucking do it" and "just do it" and she continued by saying, "I meant just kill them." I asked Mrs. Sifrit this same question approximately ten times and her answer was always the same, "I meant kill them, I knew he wanted to."

*** 

B.J. fired the Smith & Wesson into the bathroom door and then kicked it open. She described the kick as being so hard that B.J. fell backwards. The bathroom door flew open and lodged itself in the wall. B.J. went into the bathroom and Mrs. Sifrit stated she saw Josh fall to the right side of the bathroom against a closet. She said he was shot. Josh was still yelling, "Why are you doing this?" She then watched as B.J. took a "head shot" on Josh. According to Mrs. Sifrit, she then wet her pants and went to go sit on the edge of the bed and "waited for it to be over." I asked what she meant by "waited for it to be over" and she said the killings. Mrs. Sifrit said she heard two more shots close together (about 5 seconds) and then B.J. came out flexing his muscles covered in blood she described that "he had obviously put on himself." B.J. called Mrs. Sifrit into the bathroom.

Erika then went to the jeep to get their radios, check for their things on the beach, and to watch out for the police.

40

She ran back up to the penthouse and into the bathroom. She stated B.J. said, "Baby, open your knife like I taught you. Get down there and check her to see if she's dead. Get down there and make sure . . ." Mrs. Sifrit said, "But, I thought you said she . . ." and Mrs. Sifrit walked over to Martha who was huddled in the fetal position under the vanity and began "to cut on her body." I moved into the position I thought Martha would have been in and Mrs. Sifrit corrected me and she herself got into the fetal position to show exactly how Martha was and where she cut on her body. Mrs. Sifrit said the blood was very deep around Martha and it got on her clothes as she went down on her knee to cut on Martha. She showed us the right side of her abdomen above her right hip as the location she cut. She said, "I was surprised how much pressure it took to cut the skin since I had never cut someone before. I cut her twice like this." Mrs. Sifrit showed us how she held the knife and cut Martha. After saying, "I cut her twice" she stopped and said, "now you have me on murder." I asked her if Martha was dead or alive when she cut on her. Mrs. Sifrit said she did not know but thought Martha was probably dead. I asked if she checked Martha in any way before cutting on her and she said, "No."

Erika then went on to detail how the couple cut up the bodies, put them in black trash bags, placed them into Navy duffle bags and put the bodies in two separate dumpsters behind a grocery store. After sleeping for a while, the Sifrits cleaned the bathroom. The next day, on May 27, 2002, they went to the dumpsters to be sure that they had been emptied. Erika stated that sometime on May 27 or May 28, Benjamin "made a comment to her along the lines of, what a number she had done on Martha's throat. Mrs. Sifrit stated she did not deny cutting Martha's throat to B.J. She told us she was glad if he thought she had cut Martha's throat." In light of Erika's statements, the polygraph examiners did not administer the polygraph test.

It is clear, after reviewing the statements Erika made prior to her polygraph examination, that she breached the agreement by making reliable inculpatory statements and implicating herself in the murders. Once Erika breached the agreement, the State had no obligation to uphold its end of the bargain

ECF No. 9, Ex. 16, pp. 18-24.

The appellate court's determination that Petitioner breached the MOU by providing reliable inculpatory statements is supported by the record.  ECF No. 9, Ex. 16, pp. 18-24.  The State was not required to adhere to the agreement after Petitioner provided the inculpatory statements.  The appellate court's rejection of Petitioner's claim is supported by the record and does not involve an unreasonable application of clearly established federal law. As such, the decision will not be disturbed.

## III. CONFLICTING THEORIES OF THE CASE

Petitioner maintains that, in violation of her right to due process, the State took materially different positions during her trial and that of her husband.  ECF No. 1.  Petitioner has not provided specific arguments, acknowledging that this Court rejected an identical claim raised by Benjamin Sifrit.  *See Sifrit v. Rowley*, RDB-08-2327 (D. Md. 2008).  The Maryland Court of Appeals rejected Petitioner's claim regarding inconsistence prosecutions finding as follows:

> The first question presented for our review is whether the State violated Erika's right to due process by presenting factually inconsistent theories of the case at her trial and that of her husband, Benjamin. This is a matter of first impression in this State. Other courts, however, have addressed the issue and in the vast majority of cases failed to find a due process violation. We likewise fail to find a violation here.
>
> The court that has addressed the issue of inconsistent theories the most is the United States Court of Appeals for the Ninth Circuit. It first addressed the issue briefly in the case of *Haynes v. Cupp*, 827 F.2d 435 (9th Cir.1987), in which Haynes relied on evidentiary and argumentative differences between his trial and that of a co-defendant to argue that his right to due process had been violated. Then Judge, now Justice, Kennedy wrote for the court that "[i]t is true that the trials differed in emphasis. However, the underlying theory of the case, that all three defendants were equally culpable, remained consistent throughout. In view of this underlying consistency, the variations in emphasis are not cause for reversal." *Id.* at 439.
>
> More than a decade later, that court was again presented with the question

in *Thompson v. Calderon*, 120 F.3d 1045 (1997) (en banc ), rev'd on other grounds, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). In *Thompson* two men were charged for the same murder. The court found that the prosecuting attorney had offered conflicting theories regarding the two men's motives for committing the crime. In Thompson's case, the State argued that Thompson had raped the victim and then killed her to cover up the rape. *Thompson*, 120 F.3d at 1056-57. In the second defendant's case, the State argued that he had killed her because he saw her as a threat to his ability to reconcile with his estranged ex-wife. *Id*. The State presented completely different witnesses in the two trials, who, in some instances, provided testimony that wholly contradicted the testimony given in the other trial. *Thompson*, 120 F.3d at 1057. Relying in part on their *Haynes* opinion, the court stated that "it is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." *Thompson*, 120 F.3d at 1058. The court continued, however, "when there are claims of inconsistent prosecutorial conduct, reversal is not required where the underlying theory 'remains consistent'" *Thompson*, 120 F.3d. at 1058-9 (quoting *Haynes*, 827 F.2d at 439). Applying this standard to Thompson's case, the court found that "little about the two trials remained consistent other than the prosecutor's desire to win at any cost." *Thompson*, 120 F.3d at 1059. The court held that Thompson's right to due process had been violated.

In *Shaw v. Terhune*, 353 F.3d 697 (2003), the Ninth Circuit again returned to the issue. Like in *Haynes*, the court found that there had not been a due process violation. Shaw and an accomplice were both convicted of several crimes arising from an attempted robbery. Despite the fact that the evidence established that only one person had personally used a firearm during the robbery, the prosecutor argued at both trials that the man currently on trial had been the one to use the firearm. *Shaw*, 353 F.3d at 699. The court reviewed its holding in *Thompson* and found it "sufficiently dissimilar to the instant case that it is distinguishable." *Shaw*, 353 F.3d at 702. The court noted that the *Thompson* case had rested on the "'peculiar facts' of the case." *Shaw*, 353 F.3d at 702 (quoting *Thompson*, 120 F.3d at 1059). "The prosecutor in Thompson did not merely suggest varying interpretations of ambiguous evidence; he 'manipulated evidence and witnesses, argued inconsistent motives, and in [the other defendant's] trial essentially ridiculed the theory he used to obtain a conviction and death sentence at Thompson's trial.'" *Shaw*, 353 F.3d at 702 (quoting *Thompson*, 120 F.3d at 1057). "By doing so, the prosecutor brought his conduct squarely within an area forbidden by the Supreme Court-the 'knowing [] present[ation of] false testimony.'" *Shaw*, 353 F.3d at 703 (quoting *Thompson*, 120 F.3d at 1058) (internal citations omitted)

(alteration in original). Returning to the facts of *Shaw*, the court stated "[i]n this case, Shaw does not contend that the prosecutor presented false evidence, and in reality cannot do so, because the evidence was nothing more than ambiguous. The evidence presented at the two trials was almost identical, and supported several critical conclusions...." *Shaw*, 353 F.3d at 703. The Court concluded that

> [c]learly established federal law prohibits a prosecutor from "knowingly presenting false evidence;" it does not preclude that prosecutor from suggesting inconsistent interpretations of     ambiguous evidence. When prosecutors confront truly ambiguous evidence that supports multiple convictions for what is inherently a unilaterally committed crime, there are competing concerns involved. In these situations, prosecutors must retain some amount of discretion to change theories in later trials.
>
> * * *
>
> Since no clearly established federal law precludes a prosecutor from supporting two theories which are in tension with one another but which are each arguably supported by ambiguous evidence, Shaw's due process rights were not violated....

*Shaw*, 353 F.3d at 703, 705 (citing *Nguyen v. Lindsey*, 232 F.3d 1236 (9th Cir. 2000)).

The holding in *Shaw* is consistent with the Ninth Circuit case *Nguyen v. Lindsey*, in which the court found that a defendant's right to due process is not violated when a prosecutor uses inconsistent arguments at separate trials, provided the arguments are consistent with the evidence adduced at each trial and provided the prosecutor does not knowingly use false evidence or act in bad faith.[18] *Id.* at 1240.

In *Thompson*, the Ninth Circuit relied, in part, on a concurring opinion accompanying the en banc rehearing of an Eleventh Circuit case, *Drake v. Francis*, 727 F.2d 990 (11th Cir.1984), rev'd on different grounds en banc, *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985). In *Drake v. Francis*, the defendant argued that by pursuing "wholly inconsistent theories" in his and a co-defendant's trial, the prosecution violated his right to due process. *Drake*, 727 F.2d at 994. Drake and a co-defendant were charged and convicted of the murder and armed robbery of a barber in Colbert, Georgia. In the co-defendant's trial the prosecutor argued that the co-defendant committed the murder while Drake played a lesser role. In Drake's trial, a year later, the prosecutor argued that the co-defendant was too old and weak to have committed the murder by himself and that Drake must have played a more significant role. The court found that "the

44

only inconsistent theory propounded in the two trials was that [the co-defendant's] prosecutor believed [the co-defendant] was the sole murderer while in Drake's case, the district attorney urged that, due to sheer physical necessity, Drake must have participated in the attack as well." *Id*. "Viewed in this light," continued the court,"the two theories are fairly consistent and there was no due process violation." *Id*. On rehearing en banc, the majority of the court declined to reach the issue, instead granting relief on other grounds. *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985) (en banc ).

In *Smith v. Groose*, 205 F.3d 1045 (8th Cir.2000), *cert. denied, Gammon v. Smith*, 531 U.S. 985, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000), the United States Court of Appeals for the Eighth Circuit addressed the issue in the context of a prosecutor relying on two wholly inconsistent and irreconcilable statements made by the same witness. In the first of two trials in *Smith*, the prosecution relied on a statement by a witness that the victims were alive when they entered the house and that a colleague of the witness testifying had, in fact, killed the victims. *Smith*, 205 F.3d at 1048. In a subsequent trial of a different defendant, the prosecutor relied on a different statement made by the same witness that the victims were dead when they arrived at the house. *Id.* "In short, what the State claimed to be true in [the first case] it rejected in [the second case], and vice versa.... This before/after distinction is the heart of the prosecutorial inconsistency that allowed the State to convict as many defendants as possible in a series of cases in which the question of timing was crucial." *Smith*, 205 F.3d at 1050-1051. Although the court held that the actions of the State in this case "constituted foul blows ... that fatally infected Smith's conviction," the court also noted that "[w]e do not hold that prosecutors must present precisely the same evidence and theories in trials for different defendants. Rather, we hold only that the use of inherently factually contradictory theories violates the principle of due process." *Smith*, 205 F.3d at 1052. The court continued by noting that "Smith's situation is unusual, and we doubt that claims such as his will often occur. To violate due process, an inconsistency must exist at the core of the prosecutor's case against the defendants for the same crime." *Id*.

The theme requiring an inconsistency at the core of the state's case before finding a due process violation runs throughout the majority of cases that have addressed the issue. *Clay v. Bowersox*, 367 F.3d 993, 1004 (8th Cir. 2004) ("'To violate due process, an inconsistency must exist at the core of the prosecutor's cases against the two defendants for the same crime,' and the State's error must have 'rendered unreliable' the [petitioners] conviction."). *Id*. at 1004 (quoting *Smith*, 205 F.3d at 1052); *United States v. Paul*, 217 F.3d 989, 998-99 (8th Cir. 2000), *cert. denied*, 534 U.S. 829,

122 S.Ct. 71, 151 L.Ed.2d 37 (2001) ("When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecutor's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent. Thus, because there was evidence that supported both theories, and since Paul could have been convicted of aiding and abetting under either theory, we find no error."); *Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995), *cert. denied, Nichols v. Johnson*, 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996) (Finding that where the facts support the conclusion that either defendant could have fired the fatal shot, the prosecutor did not violate due process by arguing at separate trials that the man on trial was the one responsible for the fatal shot.); *Illinois v. Caballero*, 206 Ill.2d 65, 276 Ill.Dec. 356, 794 N.E.2d 251, 264 (2002) ("We conclude that no due process violation has occurred in the present case when the State's shifting positions involved matters of opinion, not of underlying fact."); *Iowa v. Watkins*, 659 N.W.2d 526, 532 (Iowa 2003) ("We are convinced that [*Thompson* and *Smith*] only stand for the proposition that a selective use of evidence by the prosecution in order to establish inconsistent factual contentions in separate criminal prosecutions for the same crime may be so egregious and lacking in good faith as to constitute a denial of due process. We view those situations as a narrow exception to the right of the prosecution to rely on alternative theories in criminal prosecutions albeit that they may be inconsistent.... This right is particularly obvious in cases in which the evidence is not clear concerning which of two persons is the active perpetrator of the crime and which of them is an aider and abettor of the active perpetrator." (Internal citations omitted.)).

Based on our analysis of the relevant case law, we are in accord with the courts that hold that a due process violation will only be found when the demonstrated inconsistency exists at the core of the State's case. Discrepancies based on rational inferences from ambiguous evidence will not support a due process violation provided the two theories are supported by consistent underlying facts. We recognize that the evidence presented at multiple trials is going to change to an extent based on relevancy to the particular defendant and other practical matters. The underlying core facts, however, should not change. The few courts that have found due process violations did so in cases where the inconsistencies were inherent to the State's whole theory of the case or where the varying material facts were irreconcilable. It is this type of inconsistency that renders the conviction fundamentally unfair, thus violating due process. With this standard in mind, we return to the present case.

46

Erika relies primarily on four ways in which she believes the State's case differed in the two trials and in which she believes the differences rise to a violation of due process. They are: (1) ownership and possession of the murder weapon, (2) the testimony of Michael McInnis, (3) the testimony of Melissa Seling, and (4) the number of shots fired by each of the Sifrits.

None of the differences in the two trials alleged by Erika go to the State's underlying theory of the case which remained consistent throughout both trials, which was that Benjamin and Erika committed the crimes together. The differences raised are differences in emphasis and inferences regarding certain facts tending to show the guilt of the defendant currently on trial, but  in no way exculpating the other Sifrit. Evidence offered tending to show Benjamin's guilt is not necessarily relevant to show Erika's guilt. Provided the evidence remains consistent with the underlying facts, the inconsistent emphasis or inferences will not amount to a due process violation.

We begin with the issue of who owned the murder weapon. The evidence presented at the two trials established that both Benjamin and Erika had access to the murder weapon throughout the week. According to the evidence, Benjamin purchased the gun, apparently for Erika, both had possession of the gun at varying times during the week following the murders, and the two often exchanged their various weapons. Based on these facts, it is not inconsistent for the State to argue at Benjamin's trial that the murder weapon was his. Nor is it inconsistent[19] with the facts for the State to argue at Erika's trial that the weapon was hers. The facts and inferences support both conclusions. Furthermore, considering the facts established that the Sifrits often exchanged their weapons and both had access to the murder weapon, determining who actually "owned" it is of no consequence.

The same is true with regard to the issue of whether Erika fired one shot or two. In both trials the State recognized that no one besides Erika and Benjamin can know for certain who fired which bullet.[20] The facts established that four shots were fired from the .357 magnum. Two of the four shots were found in Mr. Ford's torso. The other two bullets were found on the table in the Sifrit's condominium, one with flesh on it that matched Mr. Ford's DNA. It was the State's consistent theory that both Sifrits were present for the murders and that both participated in them by actually shooting at Mr. Ford and by luring the couple up to the apartment. Whether Erika's participation in the murders is limited to firing one shot or two, or simply by aiding Benjamin in luring the couple to their deaths, does not affect her culpability. Under either theory a jury could find both participants guilty of murder. This distinction falls squarely within the

permissible differences allowed in *Paul*, *Nichols*, *Caballero*, and *Watkins* discussed above.

Erika also argues that the State's characterization of the testimony of Michael McInnis ("McInnis") in the two trials amounted to a due process violation.

McInnis is a former Navy SEAL and friend of Benjamin. He was called by the defense at Erika's trial to recount a conversation that he had with Benjamin.

McInnis testified that in 1999 the two men were at a strip club having drinks when the discussion turned to how Benjamin would dispose of a body if he ever killed someone. The conversation arose when McInnis asked Benjamin to "whack" his wife for him, to which Benjamin allegedly responded "[y]eah, sure." McInnis asked what the going rate was for "whacking" someone, to which Benjamin responded around $30,000. According to McInnis, Benjamin stated that he would dispose of the body by laying down plastic in a living room or an open space and then remove the arms, legs and head with a knife. Then he would remove the body in separate bags and dispose of the body in either the same dumpster over the course of a month or in different dumpsters throughout the city in a single trip. McInnis testified that the conversation was a typical conversation between SEALs, that they were "simply talking trash with guys over a few beers," and that the conversation was not to be taken seriously.

Erika argues that the State took inconsistent positions in the two trials with regard to this testimony. In Benjamin's case, the State made reference to this evidence as "crucial," but in rebuttal closing remarks in Erika's trial the State argued:

> Michael McInnis told you as far as he was concerned, this was just guys talking over beer and nobody was serious about it. Now, that would sound easy if none of this other stuff had happened. Certainly it was a joke in McInnis's mind. In light of what happened this past Memorial day, perhaps it wasn't a joke in Benjamin Sifrit's mind. But, ladies and gentlemen, the important issue is not who quartered the bodies and put them in the dumpster, the important issue is who's responsible for their deaths?

We find Erika's argument unpersuasive. The question of whether Benjamin had thought about killing someone and how he would dispose of the dead body if he ever murdered someone is clearly more relevant to the

State's case against Benjamin than it is to Erika's guilt or innocence in her role(s) regarding the murders. This is unlike *Thompson* where the prosecutor "essentially ridiculed the theory he used to obtain a conviction and death sentence in Thompson's trial." Rather, McInnis's testimony established that Benjamin had considered committing almost the same type of crime three years before, not that he was incapable of committing the crime by himself. Furthermore, the question of whether the conversation was a joke is a matter of opinion, not fact. *See Illinois v. Caballero,* 206 Ill.2d 65, 276 Ill.Dec. 356, 794 N.E.2d 251, 264 (2002) ("We conclude that no due process violation has occurred ... when the State's shifting positions involved matters of opinion, not underlying fact."). The State's shifting position regarding whether McInnis's opinion that the conversation was a joke does not affect the core of the State's case and does not support a due process claim.

The final way in which Erika claims the State presented  inconsistent theories is with regard to its reliance and interpretation of Melissa Seling's testimony at the two trials.

Melissa Seling was called as a State's witness against Benjamin and a defense witness in Erika's trial. At various points in Benjamin's trial, Melissa stated that Benjamin had told her that he was ridding the world of bad people, or that if they were "ripping them off, you know, he has had other people rip them off and if we ripped him off like the other people that were here, he would do the same thing to us that he did to them referring to the bullet hole in the door." On cross-examination in Benjamin's trial, the defense asked Ms. Seling "[y]ou are unsure whether or not he ever said he killed anyone, she killed anyone, or they both killed anyone; isn't that right, Ms. Seling?" To which she responded, "[n]o matter how you pick apart the words, he admitted to me throughout the night that in one way or another he was involved in the murder of these two people." Counsel then questioned her regarding her statement to the police shortly after the murders in which she said "[h]e was waving the gun around and making connotations to the people that they murdered and I am not sure if it was he murdered or she murdered or they both, you know, murdered them." The attorney asked if that was the truth at the time and she said it was still the truth. She eventually responded:

He stated to me several times throughout the night that he was involved in these murders. Those ID's, those people, you know, with the bullet in the door and everything. You can't just pick words apart like that and try to shift the blame, you know.   The two people were there that night, four people and only two came out and that is what this is about.

In its closing argument in Benjamin's trial, the State argued that Melissa:

> is the best witness in this case, and I don't say that just because her testimony helps the State a lot, but everybody else in this case was so-had been drinking and Melissa had not.
>
> * * *
>
> She told you the defendant told her, "If you're ripping us off, I'll do the same to you as I did to that other couple." He claimed he was ridding the earth of bad people. He admitted that he was involved in the killing of those two people, and he told her, "I don't overreact; I just react."

Later, in its rebuttal argument, the State argued:

> Melissa told you the truth. Melissa was under oath today. She was not under oath when she talked to the police. There is no testimony or evidence that they placed her under oath when they questioned her.

The State then argued that Benjamin had admitted to these murders and that he had opened his heart to Melissa in stating "I killed two people. I killed two people."

In Erika's trial, Melissa was called as a defense witness and aggressively examined. She testified essentially as she did at Benjamin's trial with the same uncertainty regarding whether Benjamin uttered "he killed, she killed, they killed." The defense, obviously, was emphasizing her statements in which she stated Benjamin had said he killed the people or words to that effect. On cross-examination she testified that she was not positive which pronoun, "I, she, they," Benjamin had used, but that her general impression was that he was involved. She also confirmed that she has never testified that Benjamin said anything about Erika not being involved.

> In its closing remarks in Erika's trial, the State argued:
>
> Melissa Seling was called to the stand Friday by the defense. She was a defense witness. Melissa Seling told you that she wasn't drinking that night, and that's uncontradicted. But B.J. was.
>
> * * *

Melissa was told that there has been another couple there a couple of nights before who tried to rip them off, and she told you that the defendant's husband said either I killed, she killed, or we killed, she wasn't sure which. Now, granted on one occasion she said I killed, quoting the husband. On another occasion she said we killed. Because of that contradiction, Det. Case told you that he asked her to clarify that, and then that's when she came back and said I killed, we killed, she killed, she wasn't sure.

The main thrust of the State's closing argument, however, was that the two were working as a team:

These two people are working as a team, ladies and gentleman. Erika, the defendant in this case, and B.J. Sifrit were working as a team. They worked as a team all week long. They were working as a team when they broke into Hooters. They were working as a team, we  know, when they lured Melissa back to the unit, and I would submit, ladies and gentleman, they were working as a team when they got Josh and  Geney back to the unit and ultimately killed them. Why invite two people  back to your unit, your room, if you're completely innocent of what had  happened a few nights before? Why would you ask two people to come back there and risk being harmed? If your husband is the bad guy, if your husband is the murdering son-of-a-gun that did this, why would you invite another couple to come there? It's an easy answer. Because you participated in  it. You got a rush. You wanted them to come back. You wanted another rush.

Based on our review of the record, we find no inconsistency in the State's position in the two cases. Melissa's testimony, while at times confused regarding whether Benjamin said "I killed, she killed or they killed," was fundamentally consistent throughout both trials. She may have been confused at various times regarding the pronoun used, however, she was clear that her impression of Benjamin's comments that night was that Benjamin had participated in the murder. She did not testify that anything that night led her to believe Erika was not involved, nor has the State ever taken this position. We find no inconsistency in the State's position sufficient to justify concluding that a due process violation occurred.

---

[18]      From a practical standpoint, the *Nguyen* court noted:

Nor is it shocking or even unusual that the evidence came in somewhat differently at each trial. Any lawyer who has ever tried a case knows that trial preparation is not a static process. As a case evolves, new witnesses come forward; others become unavailable. As new evidence is uncovered, other evidence loses its significance. What is received in evidence by

stipulation in one trial might draw vigorous objections in another.

*Nguyen*, 232 F.3d at 1240.

[19]     The State's actual argument in Benjamin's trial regarding the weapon was, in part, that "Benjamin Sifrit, the defendant, controlled both guns on various occasions" and that the gun "was purchased by the defendant. He picked it out for his wife, and yet he would have you believe that he never fired it."

[20]     In Benjamin's trial the State argued:

I will never know and you will never know who pulled the trigger on that gun that night, but one thing is for certain: they were both there and they both-whichever one of them didn't pull the trigger aided and abetted the murder by helping the other one.

 In Erika's trial the State argued:

 No one in this room will ever know who did what to whom that night. There's certainly inferences to be drawn from the facts in this case, and the State has argued those inferences to you, but none of us will ever know definitively what happened in that room, but it's clear that the defendant was there. It's clear that the defendant participated to the extent of luring these people up there. She aided and abetted the crime of murder, which makes her guilty of the crime of murder.

ECF No. 9, Exs. 16 & 17.

"A fair trial in a fair tribunal is a basic requirement of due process."  *In re Murchison*, 349 U.S. 133, 136 (1955).   Likewise, prosecutors are held to a high standard of fairness.  *See Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.").  The Court finds no prejudicial misconduct on the part of the prosecutor that unlawfully burdened Petitioner's rights and "so infected the trial with unfairness as to make the resulting conviction a

denial of due process." *See Darden v. Wainwright*, 477 U.S. 168, 180-81 (1986); *United States v. Caro*, 597 F.3d 608, 624 (4th Cir. 2010).   In the Fourth Circuit, in order to reverse a conviction based upon prosecutorial misconduct, "the defendant must show (1) 'that the prosecutor's remarks or conduct were improper' and (2) 'that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial.'" *Caro*, 597 F.3d at 624-25.

As discussed thoroughly by the Maryland Court of Appeals, federal courts in applying due process standards to claims of inconsistent prosecutions have found that there are situations where the prosecution is prohibited from asserting inconsistent positions in separate criminal proceedings, based on the defendant's right to due process of law.   However, "[t]o violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime." *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000). No such inconsistency exists in the present case.   As this Court previously has noted:

> From the beginning of both Petitioner and [Benjamin] Sifrit's prosecutions, the government consistently asserted one theory of the case-that both defendants acted in concert to murder Joshua Ford and Martha Crutchley— and that no one would ever know, aside from Petitioner and [her husband], what precisely transpired that night.   What the prosecution consistently demonstrated was that Petitioner and [Benjamin] Sifrit worked in concert in murdering the victims and attempting to cover up the crimes.   While the prosecutor highlighted and emphasized different evidence in Petitioner's trial than in [Benjamin] Sifrit's trial, the evidence highlighted did not go to the core theory of the case and as such did not deprive Petitioner of a fair trial.

*See Sifrit v. Rowley,* RDB-08-2327 (D. Md. 2008) (ECF No. 13).   *See Bradshaw v. Stumpf*, 5454 U.S. 175, 187 (2005) (Petitioner's assertions of inconsistency in prosecution went to facts

immaterial to Petitioner's conviction).[4]  Assuming, arguendo, that the applicable law is clearly established by the Supreme Court, this Court agrees with the Maryland Court of Appeal's determination that Petitioner was not denied due process.  Moreover, after careful review of the record, this Court finds that the Maryland Court of Appeal's findings concerning the facts developed at each trial and the emphasis placed thereon by the prosecution are supported by the record, and are therefore deemed presumptively correct pursuant to 28 U.S.C. § 2254(d) and (e). Accordingly, the determination of the Maryland Court of Appeals shall not be disturbed here.

## IV.  UNLAWFUL SEARCH OF PETITIONER'S PURSE

Petitioner alleges that the trial court's denial of her motion to suppress the evidence seized from her purse was improper and that it was error for the Court of Appeals to uphold the trial court's decision.  ECF No 1, pp. 11-12. Even if a flaw could be found in the state courts' reasoning, federal habeas relief on a Fourth Amendment exclusionary rule claim is unavailable. As observed by the Supreme Court, the purpose of excluding evidence obtained in violation of the Fourth Amendment is to deter misconduct of law enforcement officers conducting the searches.  *See Stone v. Powell*, 428 U.S. 465, 490-492 (1976).  Providing an additional avenue for exclusion of evidence through federal habeas relief is unlikely to deter misconduct; thus, the proper focus is on whether or not the Fourth Amendment claim was given full and fair consideration in the state courts below.  *Id*.  In the instant case Petitioner received a full hearing

---

[4] Respondents maintain, *inter alia*,  that there is no applicable law concerning inconsistency in prosecutions established by the Supreme Court and as such Petitioner's claim should be rejected.  ECF No. 9.  S*ee Bradshaw*, 545 U.S. at 190 ("This Court has never hinted much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories.") (Thomas, concurring).  *See also, Fotopoulos v. Secretary, Department of Corrections*, 516 F. 3d 1229. 1235 (11th Cir.) (noting that it would be "fanciful to suggest" that *Bradshaw* should control a state court decision that became final several years prior to the issuance of that opinion, and also that "the *Bradshaw* Court did not hold that use of inconsistent theories in the prosecution of two defendants violates the right to due process."

on her motion to suppress the evidence where she was represented by counsel.  Accordingly, there is no basis presented for federal habeas relief and the Petition must be denied.

### Conclusion

The record establishes, and this Court determines, that Petitioner is not entitled to federal habeas relief.  There is no basis upon which to find constitutional deficiencies in the state court proceedings, and Petitioner has failed to rebut the presumption of correctness of the findings of fact underlying the rejection of her grounds for post-conviction or appellate relief.

Additionally, a Certificate of Appealability is not warranted at it may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U. S.C. § 2253(c)(2).  The Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a Certificate of Appealability shall be denied.  *See* 28 U. S.C.§ 2253(c)(2).

Accordingly, the Petition shall be dismissed with prejudice and a Certificate of Appealability shall not issue. A separate Order follows.

October 10, 2014                              _____/s/_____ _____
                                             RICHARD D. BENNETT
                                             UNITED STATES DISTRICT JUDGE